## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

PATRICIA O'DONNELL,        :
  Plaintiff          :    CIVIL ACTION
              :
     v.         :
              :    NO. 08-1560
LRP PUBLICATIONS, INC.      :
  Defendant         :

**February 16, 2010**              **Anita B. Brody, J.**

## MEMORANDUM

This case arises out of Patricia O'Donnell's work at, and ultimate termination from,

Human Resources Executive Magazine. In the Amended Complaint, Plaintiff alleges gender

discrimination under Title VII (Count I) and the Pennsylvania Human Relations Act (Count II),

and a violation of the Pennsylvania Wage Payment and Collection Law (Count III). Defendant

moves for summary judgment on all three counts.[1]

---

[1] Jurisdiction over Count I of the Amended Complaint is proper pursuant to 28 U.S.C. § 1331.
Supplemental jurisdiction over Counts II and III is proper pursuant to 28 U.S.C. § 1367.

**I. BACKGROUND**[2]

From January 3, 2005 through February 2, 2007, Plaintiff Patricia O'Donnell ("O'Donnell") was employed as a sales representative selling advertising space in Defendant LRP Publications, Inc.'s ("LRP") Human Resources Executive Magazine ("HRE Magazine").[3]

A. Facts pertinent to Plaintiff's gender discrimination claims

LRP's HRE Magazine division employed seven sales representatives, one for each of seven sales territories. O'Donnell, who was responsible for the New York territory, was the only female sales representative. O'Donnell's compensation consisted of a base salary and a commission. Because the New York territory was historically the highest producing territory in terms of advertising pages sold for HRE Magazine, O'Donnell had the highest base salary of any sales representative. Her commission payments were largely based upon the number of advertising pages she sold for HRE Magazine ("page sales"). HRE Magazine also used page sales to measure a sales representative's performance.

In 2004, before O'Donnell began working at HRE Magazine, the New York territory sold 218.89 pages of advertising space. That number dropped to 147.4 pages in 2005, and further declined to 107.42 pages in 2006. HRE Magazine had a sales goal of 226 advertising pages for the New York territory in 2005. O'Donnell thus fell 78.6 pages below the 2005 page sales goal. For the second and third quarters of 2006, O'Donnell fell 24.1 pages below her sales goal. This

---

[2] For purposes of summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (internal quotations omitted). Here, the facts are stated in the light most favorable to O'Donnell, with all justifiable inferences drawn in her favor.

[3] Defendant is referred to herein as LRP and as HRE Magazine.

was the worst performance of any sales representative for that time period.[4] From 2004 to 2006, page sales also fell for some of the male sales representatives, but none of the male sales representatives were terminated.

On December 21, 2006, Rebecca McKenna ("McKenna"), Publisher of HRE Magazine, and Jim Maddox ("Maddox"), the national sales director, met with O'Donnell to discuss her sales performance. O'Donnell admitted that her "numbers were not too good at that point" and that "the fact that we were having the meeting was a red flag." The meeting identified six goals: (1) meet 2007 rate protection goal of 115 pages by February 2, 2007, (2) meet personal sales calls goal of 90 personal sales calls by February 2, 2007, (3) meet proposal goal of 50 submitted 2007 proposals by February 2, 2007, (4) meet February 2007 issue page sales goal of 8.4 pages, (5) meet March 2, 2007 issue page sales goal of 5 pages, and (6) meet March 16, 2007 issue page sales goal of 10 pages. McKenna, Maddox, and O'Donnell anticipated meeting on January 26, 2007 to discuss O'Donnell's progress towards these goals. Maddox later rescheduled that meeting to take place on February 2, 2007.

---

[4] Defendant also points to O'Donnell's poor performance in the rate protection contest. The rate protection contest measures the number of clients who participate in HRE Magazine's rate protection program, which offers clients the ability to keep pricing at the same level from the previous calendar year if they express their intention to purchase pages for the new calendar year. The client's statement of intention is not a binding contract, so some clients express an intention to purchase pages for purposes of the rate protection program, but later fail to actually purchase any advertising pages. O'Donnell contends that, because some participants in the rate protection program will ultimately decline to purchase any advertising pages, the rate protection program is a poor measure of employee performance. She also testified that the New York territory includes an unusually high number of advertising agencies, who are less likely to participate in the rate protection program than other clients. The significance of the rate protection contest as a measure of employee performance in the New York territory is another disputed fact.

By late January 2007, O'Donnell began removing personal items from the office because she believed that she would be fired. By February 2, 2007, it was clear that O'Donnell failed to meet three of the four goals that could be measured at that time. On February 2, 2007, O'Donnell met with McKenna, Maddox, and Alison Hays, a human resources representative. HRE Magazine terminated O'Donnell's employment at that meeting. HRE Magazine claims that it terminated O'Donnell because she failed to meet her page sales goals and because of her overall sales performance.

On April 5, 2007, O'Donnell filed a written charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging gender discrimination. The EEOC issued a Notice of Right to Sue on January 2, 2008. O'Donnell believes that the following facts support her allegation of discrimination:

- Of the seven sales representatives, only O'Donnell was female. After she was terminated, O'Donnell was replaced with a male sales representative, Joseph Kirschen ("Kirschen"), who had fewer qualifications and lacked knowledge about the sales territory.

- McKenna repeatedly suggested that O'Donnell date McKenna's brother. O'Donnell testified that "it's very uncomfortable to have your boss suggest that you might be interested in her brother" because "[i]t puts pressure on you when you feel your boss wants you to do something that you don't want to do, you don't think it's appropriate."

- Maddox, HRE Magazine's national sales director, failed to offer O'Donnell the same assistance and support that he offered the other, male employees.

4

O'Donnell testified that Maddox worked with the male sales representatives at least once each month, but that Maddox helped her only five or six times over two years. Maddox testified that he spent approximately seventy-five percent of his time traveling to trade shows and with sales representatives on sales calls. Yet, Maddox could recall only five sales calls where he accompanied O'Donnell. O'Donnell claims that her sales performance was adversely impacted by Maddox's failure to provide her with adequate assistance.

- Maddox isolated O'Donnell from the sales staff. O'Donnell testified:

> He would drop his briefcase off, walk by my desk without acknowledging me, directly to the men, and have a conversation with them about the sports from the night before, or whatever. And then when he was done chit-chatting with them, he would walk by me again, without acknowledging me in any way, and go into his office. So it created this feeling of being isolated from the rest of the group, like he didn't want me to mingle with him or the other – or the sales team.

In addition, O'Donnell points to facts supporting her contention that the decrease in page sales in the New York territory was caused by factors other than her performance. Prior to O'Donnell's employment, MetLife was the largest client in the New York territory, purchasing over 200 pages of advertising space in HRE Magazine each year. After O'Donnell began working there, HRE Magazine made a decision to split the MetLife account, that is, for two sales representatives in two different territories to share responsibility for the account. After the account was split, O'Donnell shared responsibility for MetLife with Art Rosenberg ("Rosenberg") and the total number of pages sales was split between her and Rosenberg.

Also, O'Donnell explained that her page sales decreased because of a shift from print to internet-based advertising. O'Donnell testified that MetLife, in particular, which purchased close to $300,000 of internet-based advertising, shifted from print to internet-based advertising during her employment at HRE Magazine. Internet-based advertising increased revenues for HRE Magazine, but was excluded from page sales.

O'Donnell thus claims that Defendant's statement that it terminated her employment because of her poor sales performance is merely a pretext for discrimination or, most favorably to Defendant, that Defendant had mixed motives in its decision to terminate her employment.

Defendant contends that it has ample evidentiary support for its statement that it terminated O'Donnell because of her poor sales performance. It notes that the New York territory had the most dramatic decline in page sales from 2004 to 2006 and that O'Donnell consistently failed to meet her goals in the rate protection contests. Further, Defendant states that this decline cannot be explained by the shift from print to internet-based advertising because that transition affected all of the sales territories. Finally, Defendant argues that although O'Donnell was deprived of Maddox's assistance, she instead received training and support from McKenna, who was familiar with the New York territory because she had previously handled it as a sales representative.

B. Facts pertinent to Plaintiff's wage payment claim

On January 25, 2005, O'Donnell signed an employment agreement that covered the terms and conditions of her employment at HRE Magazine (the "Employment Agreement"). The Employment Agreement provided that O'Donnell would receive a base salary, plus a commission that would be determined based on the sale of advertising generated from within the

New York territory.  O'Donnell contends that HRE Magazine failed to pay her for certain sales

commissions that she earned prior to termination.

Section 3.3 of the Employment Agreement requires the return of property upon

termination.  It states:

> Upon termination of this Agreement, all property of the Company in the
> possession or control of Employee, shall be returned in normal working condition,
> normal wear and tear excepted, to the Company within two business days after the
> Termination Date including, but not limited to; . . . computer files, customer lists .
> . . The Employee agrees to represent to the Company that she has complied with
> the provisions of this Section 3.3 within fifteen (15) business days after the
> Termination Date.

Section 3.4 of the Employment Agreement provides for the forfeiture of unpaid

commissions if the employee fails to comply with Section 3.3.  Section 3.4 states, in part:

> Upon termination of this Agreement, all Commissions earned but not yet paid to
> the Employee prior to the Termination Date (the "Unpaid Commission") shall be
> forfeited unless (i) the Employee complies with the obligations set forth in Section
> 3.3.

In January and February 2007, O'Donnell forwarded several emails she received at work

to her personal email address.  On February 20, 2007, LRP wrote O'Donnell stating that she is

ineligible "to receive further commissions based upon your employment" because "it has come to

LRP's attention that you have emailed yourself client info, contact info and other proprietary

information in direct violation of your Employment Agreement."[5]

---

[5] The February 20, 2007 letter also referenced other portions of the Employment Agreement,
including its Communication Policy, which prohibited using the email system to send or receive
"copyrighted materials, trade secrets, proprietary financial information or similar materials
without prior authorization," and the provision on Confidentiality, which provided that all
confidential information "is the exclusive property of the Company."

HRE Magazine contends that, because O'Donnell violated Section 3.3 by failing to (1) return company property (the emails) and (2) represent, within fifteen days of termination, that she complied with Section 3.3, O'Donnell forfeited her outstanding commission payments. O'Donnell concedes that she failed to represent that she complied with Section 3.3.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is a "genuine" issue of material fact if the evidence would permit a reasonable jury to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The "mere existence of a scintilla of evidence" is insufficient. Id. at 252.

The moving party must make an initial showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-movant must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In determining whether the non-moving party has established each element of its case, the court must draw all reasonable inferences in the non-moving party's favor. Id. at 587.

**III. DISCUSSION**

In the Amended Complaint, Plaintiff alleges gender discrimination under Title VII (Count I) and the Pennsylvania Human Relations Act (Count II), and a violation of the Pennsylvania Wage Payment and Collection Law (Count III).

A. Sex Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff may use either the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or the mixed-motive approach established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Makky v. Chertoff, 541 F.3d 205, 213 (3d Cir. 2008). The mixed-motive formulation allows a plaintiff to proceed where she can show that an employment decision was based on both legitimate and discriminatory reasons. Id.[6]

1. The McDonnell Douglas burden-shifting framework

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its decision. Id. If the defendant succeeds, the burden returns to the plaintiff to show that the employer's stated reason for termination was merely pretext for intentional discrimination. Id. at

---

[6] The Pennsylvania Human Relations Act, 43 Pa.C.S.A. § 951, *et seq*., also prohibits sex discrimination. The McDonnell Douglas framework applies to employment discrimination cases brought under the Pennsylvania Human Relations Act. See Fairfield Twp. Volunteer Fire Co. No. 1 v. Pennsylvania Human Relations Com'n, 530 Pa. 441, 444 (Pa. 1992). Thus, I discuss this case only under federal law.

804. The ultimate burden of persuasion remains with the plaintiff at all times. St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

Defendant concedes that, for purposes of this summary judgment motion, O'Donnell has

established a prima facie case. It is also clear that the second part of the McDonnell Douglas

framework has been satisfied: HRE Magazine claims that it terminated O'Donnell because of

her poor sales performance. Thus, with respect to the McDonnell Douglas framework, the issue

is whether Plaintiff has presented sufficient evidence for a reasonable jury to find that HRE

Magazine's statement that it fired O'Donnell for poor sales performance was mere pretext.

To establish pretext, a plaintiff may either persuade "the court that a discriminatory

reason more likely motivated the employer or . . . that the employer's proffered explanation is

unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). See

also Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994). O'Donnell has submitted sufficient

evidence for a reasonable jury to find that a discriminatory reason more likely motivated the

employer. First, O'Donnell has presented evidence to demonstrate that HRE Magazine declined

to terminate male sales representatives with falling sales. Although none of the male sales

representatives' decline in sales was as severe as O'Donnell's, a reasonable jury could find that a

large portion of O'Donnell's decline in sales could be explained by reasons unrelated to

performance, e.g., turning MetLife into a split account and the shift from print to internet-based

advertising. If the decline in page sales in the New York territory was related to factors other

than O'Donnell's performance, then a jury could find that a discriminatory reason motivated

HRE Magazine's decision to terminate O'Donnell, especially where none of the male sales

representatives with decreasing page sales were terminated.

Second, O'Donnell has presented evidence demonstrating that she was denied assistance and support from her supervisors, who spent more time working with male sales representatives. Maddox could recall only five sales calls where he accompanied O'Donnell; both Maddox's and O'Donnell's testimony suggest that Maddox accompanied the male sales representatives on sales calls more frequently. A jury could reasonably find that the decline in page sales in the New York territory was caused by the relative absence of supervisor involvement with those accounts and that O'Donnell's poor performance was attributed to a lack of support, training, and assistance. Such facts would support a finding of discrimination. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 540 (3d Cir. 1992) ("This Court has recognized that when an employer discriminatorily denies training and support, the employer may not then disfavor the plaintiff because her performance is affected by the lack of opportunity"); Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 235 (3d Cir. 1987) ("Such evidence supports the reasonable inference that Jackson was treated less favorably than his white colleagues in ways that could explain any 'deficiency' in his performance").

These factors, combined with evidence that O'Donnell was replaced with a male sales representative, that her supervisors showed favoritism towards male sales representatives, that McKenna repeatedly suggested that O'Donnell date McKenna's brother, and that Maddox created a hostile environment by isolating O'Donnell from the male sales staff, are sufficient for a jury to find that HRE Magazine's justification for its decision to terminate O'Donnell was mere pretext. Thus, with respect O'Donnell's Title VII claim, I will deny the motion for summary judgment and permit O'Donnell to proceed under McDonnell Douglas.

11

2. The mixed-motive approach

The mixed-motive approach applies where a plaintiff contends that an adverse

employment decision was made for both legitimate and discriminatory reasons.  The Third

Circuit has noted:

> The McDonnell Douglas burden-shifting framework does not apply in a
> mixed-motive case in the way it does in a pretext case because the issue in a
> mixed-motive case is not whether discrimination played the dispositive role but
> merely whether it played "a motivating part" in an employment decision.

Makky, 541 F.3d at 214.  See also 42 U.S.C. § 2000e-2(m) ("an unlawful employment practice is

established when the complaining party demonstrates that . . . [sex] was a motivating factor for

any employment practice, even though other factors also motivated the practice").[7]

To succeed using a mixed-motive approach, "a plaintiff need only present sufficient

evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race, color,

religion, sex, or national origin was a motivating factor for any employment practice."  Desert

Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (internal quotations omitted).[8]  This requires a

---

[7] After a mixed-motive plaintiff establishes an unlawful employment practice, the employer may
avail itself of an affirmative defense if it can "demonstrat[e] that [it] would have taken the same
action in the absence of the impermissible motivating factor."  Desert Palace, Inc. v. Costa, 539
U.S. 90, 95 (2003) (quoting 42 U.S.C. § 2000e-5(g)(2)(B)).  This defense limits the plaintiff's
remedies, but fails to completely eliminate liability.  42 U.S.C. § 2000e-5(g)(2)(B) (the court
"shall not award damages or issue an order requiring any admission, reinstatement, hiring,
promotion, or payment").

[8] Courts have split on whether a mixed-motive plaintiff must satisfy each of the elements of the
McDonnell Douglas prima facie case, and the Third Circuit has declined to address that issue.
See Makky, 541 F.3d at 215; White v. Baxter Healthcare Corp., 533 F.3d 381 (6th Cir. 2008).   It
is similarly unnecessary for me to opine on that issue, as Defendant concedes that, for purposes
of this summary judgment motion, O'Donnell has established a prima facie case of
discrimination.

showing that (1) the defendant took an adverse employment action against the plaintiff, and (2) sex was a motivating factor for the defendant's action.  See White v. Baxter Healthcare Corp., 533 F.3d 381, 400 (6th Cir. 2008).  The mixed-motive formulation anticipates that there may be both a legitimate and prohibited reason for the defendant's action.  Thus, a defendant cannot avoid liability by simply pointing to a legitimate reason for the adverse employment action.

For the reasons discussed above, O'Donnell has provided sufficient evidence for a jury to conclude that sex was a motivating factor for HRE Magazine's decision to terminate her employment.  Thus, with respect to Count I, I will also allow O'Donnell to proceed using a mixed-motive approach.

B. Pennsylvania Wage Payment and Collection Law

In Count III, O'Donnell alleges a violation of the Pennsylvania Wage Payment and Collection Law (the "WPCL"), 43 Pa. C.S. § 260.1, *et seq.*  The WPCL provides that "[w]henever an employer separates an employee from the payroll . . . the wages or compensation earned shall become due and payable not later than the next regular payday of his employer on which such wages would otherwise be due and payable."  43 P.S. § 260.5.  O'Donnell contends that HRE Magazine failed to pay O'Donnell for the commissions that she earned prior to termination.

HRE Magazine asserts that O'Donnell forfeited her entitlement to those commission payments by violating the Employment Agreement.  Section 3.4 of the Employment Agreement provides that, upon termination of the Employment Agreement, "all Commissions earned but not yet paid to the Employee prior to the Termination Date (the 'Unpaid Commission') shall be forfeited unless (i) the Employee complies with the obligations set forth in Section 3.3."  Section

13

3.3 of the Employment Agreement requires that an employee return all property upon termination and that the employee "represent to the Company that she has complied with the provisions of this Section 3.3 within fifteen (15) business days after the Termination Date." O'Donnell concedes that she failed to provide a representation that she complied with the provisions of Section 3.3.[9]

The WPCL requires that an employer pay all wages that are earned. It is the Employment Agreement, however, that governs whether O'Donnell actually "earned" the commissions subject to this dispute. See Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990) ("WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned."). Thus, the first question I must address is whether, under the Employment Agreement, O'Donnell earned the commissions prior to termination.

If O'Donnell earned the commissions prior to termination, then a court must consider whether Section 3.4 of the Employment Agreement is valid. Because parties are prohibited from contracting around the WPCL, it is therefore possible this employment agreement is invalid if it deprives an employee of commissions already earned. See 43 P.S. § 260.7 ("No provision of this act shall in any way be contravened or set aside by a private agreement.").

---

[9] Because O'Donnell's failure to represent that she complied with Section 3.3 violates the terms of the Employment Agreement, it is unnecessary for me to consider whether the emails in question are company property.

In this case, neither party has briefed (1) whether O'Donnell "earned" the commissions prior to termination or (2) whether, if O'Donnell had already earned the commissions, Section 3.4 of the Employment Agreement is invalid under the WPCL. Thus, I will deny Defendant's summary judgment motion without prejudice to the parties to brief this issue before trial.

## IV. CONCLUSION

For the reasons stated above, I will deny Defendant's motion for summary judgment.


s/Anita B. Brody

_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:          Copies **MAILED** on _____ to: